ROCKLAND MUTUAL INSURANCE COMPANY *vs.*
COMMISSIONER OF INSURANCE.

Suffolk.   December 21, 1971. — December 28, 1971.

Present: CUTTER, REARDON, BRAUCHER, & HENNESSEY, JJ.

*Insurance*, Certificate of authority to write insurance.   *Statute*, Construction.   *Mandamus.*

In a confused statutory situation, a consistent, long continued, administrative practice of a public officer charged with regulating a large industry is entitled to weight in statutory interpretation. |674–675|

A mandamus petition by an insurance company to compel the Commissioner of Insurance to amend immediately the company's certificate of authority to include authority to write compulsory bodily injury motor vehicle liability policies was denied, but not dismissed, in a confused statutory situation and on an inadequate record, and the petitioner was remitted to renewing its application before the commissioner and requesting a full hearing and a complete record concerning the fitness of the petitioner to write the desired policies; and after such hearing the commissioner should make adequate findings and state in detail the reasons for his decision. |675–676|

PETITION for a writ of mandamus filed in the Superior Court on November 12, 1971.

The case was heard by *Travers*, J.

The case was submitted on briefs.

*Alan H. Robbins* for the petitioner.

*Robert H. Quinn*, Attorney General, & *Timothy F. O'Leary*, Assistant Attorney General, for the respondent.

CUTTER, J.   The petitioner (Rockland) seeks a writ of mandamus to compel the commissioner to amend Rockland's certificate of authority (see G. L. c. 175, § 32, as amended through St. 1941, c. 342, § 1; see fn. 3, *infra*) or, in the alternative, to acknowledge by a published ruling that Rockland is authorized (without such an amendment) to transact certain lines of insurance business.   See G. L. c. 175, § 113C, as amended through St. 1971, c. 520, § 1.

The pleadings and a stipulation establish the following facts. Rockland is a mutual insurance company incorporated in Massachusetts. It is presently licensed to transact business under G. L. c. 175, § 47, clauses First, Second (b), and Eighth, and also under §§ 54E and 54F. Rockland has formally applied to the commissioner to amend its certificate to include the coverages mentioned in c. 175, § 54C, as amended (see fn. 2, *infra*). The commissioner denied Rockland's application and refused to amend its previously held certificate. Rockland presently satisfies the financial requirements to transact business under §54C.

Rockland asserts (and we assume) that in recent years a major part of its business has been automobile property damage insurance (see c. 175, § 47, Second [b]) and that the enactment of the so-called "no fault property damage law" (St. 1971, c. 978, as affected by St. 1971, c. 1079) will result in the "virtual extinction" of this part of Rockland's business "because it includes the property damage coverage within [or as closely related to] the compulsory bodily injury coverages issued by insurance companies" and referred to in c. 175, §§ 54C, 113A, and 113B. Rockland in its brief concedes that its "present, certificate . . . does not *expressly* include within its wording the authority to issue compulsory (bodily injury) motor vehicle liability insurance under" § 54C.

A Superior Court judge ruled on December 14, 1971, that § 54C merely authorizes an insurance company (to the extent provided in § 54C) to conduct specified lines of insurance business without having to amend its articles of organization or purpose clause so as to include such lines, if they had not previously been so included. He referred (a) to c. 175, § 47, as setting forth the "types of insurance business for which a company may be incorporated," [1] and

---

[1] Related sections include § 48 (concerning the lines of business which a stock company may conduct with specified other lines of insurance business), as amended through St. 1970, c. 876, § 10, and § 48A (as appearing in St. 1946, c. 471, § 4), a similar provision concerning mutual companies.

(b) to § 54, which provides that no domestic mutual company "shall transact any other kind of business than . . . is specified in its . . . agreement of association," with specified statutory exceptions, which the judge regarded as comparable to § 54C.[2] He ruled that c. 175, § 32,[3] as amended, requires a company to obtain from the commissioner "an amended certificate . . . [under § 32] each time . . . [its] business is expanded to include another type of coverage." He entered an order that the petition be dismissed. Rockland appealed.[4]

1. The principal issue is the proper interpretation of c. 175, § 32 (fn. 3) and § 54C (fn. 2) as applied to Rockland. We proceed on the premise that Rockland is a mutual company which (a) is authorized to write property damage insurance by its existing certificate but not authorized (by any amendment to its certificate) to write compulsory

---

[2] Section 54C, as amended by St. 1961, c. 168, § 5, reads: "Any company authorized to transact the kinds of business specified in the first or second clause, or in subdivision (b) of the sixth clause, of section forty-seven may insure against any loss of or damage to, or loss of use of, motor vehicles . . . their fittings or contents, or against legal liability for loss or damage on account of injury to or death of any person or on account of any damage to property of another, arising out of the ownership, maintenance or use of said vehicles . . . provided it maintains a surplus to policyholders including any guaranty capital, of not less than six hundred thousand dollars."

[3] Section 32, as amended through St. 1941, c. 342, § 1, reads: "No domestic company shall make or issue *any contracts or policies of insurance* . . . until it has obtained from the commissioner a certificate, in such form as he may prescribe, stating that the company has complied with the conditions set forth in this section and all other provisions of law, and authorizing it to make or issue *such* policies or contracts. No such certificate shall be issued until the commissioner is satisfied, by such examination as he may make and such evidence as he may require, that the company has complied with the laws of the commonwealth, adopted a proper system of accounting, and employed a competent accountant, a competent claim manager and a competent and experienced underwriter, nor until the commissioner is satisfied, by such examination as he may make and by an affidavit filed with him as required under section four and by such other evidence as he may require, that the company is without liabilities, except such organization expenses as the commissioner shall approve as reasonable, and except . . . [exceptions not relevant] provided, that if the commissioner is of the opinion that the granting of such a certificate to *any* company would, in any case, be prejudicial to the public interest, he may *in his discretion* refuse to issue it" (emphasis supplied).

[4] Because of the imminence of the effective date of St. 1971, c. 978, § 2 (January 1, 1972), the case has been submitted to us on the original papers. We ordered (December 21, 1971) certain further information to be transmitted to us.

bodily injury policies; (b) meets the policyholders' surplus requirements of $600,000 contained in § 54C; and (c) is considered by the commissioner, in his discretion, to be one which should not be permitted (in "the public interest") to write bodily injury insurance under § 54C.

Chapter 175, § 54, requires that a domestic mutual company shall be confined to the lines of business specified in its agreement of association, but that in addition it may also carry on certain further lines in circumstances described in later subdivisions of § 54. Section 51 contains somewhat similar provisions with respect to the lines of business of stock companies. Sections 54A to 54F (which relate at least to all domestic companies [whether stock or mutual] meeting the requirements of these sections, respectively) immediately follow § 54. We are of opinion that they are intended to describe additional lines of insurance which the specified stock (see § 51) and mutual (§ 54) companies may write without amendment of their corporate purposes and articles of association. At least as to §§ 54B, 54C, and 54D, authority for these additional powers was introduced in the Commonwealth by St. 1945, c. 384, § 2. This statute was a consequence of the then commissioner's recommendation that there be an expansion of the lines of insurance that certain companies were empowered to write by adopting a program of multiple line underwriting to the extent described in the recommendations. See 1945 House Doc. No. 94, pp. 3–7; 1945 House Bill No. 96. The placement of the new sections in c. 175 immediately after §§ 51 and 54, is strong indication that they were describing merely additional lines authorized for certain domestic stock and mutual companies, notwithstanding more limited purposes stated in their articles of association.

2. A further question relates to § 32 (see fn. 3, *supra*). Rockland contends that § 32 has application only to the initial organization of domestic companies. There is much language in the section that points to this conclusion. The first sentence of § 32 and the proviso in the second sen-

tence of the section, however, if read by themselves, could reasonably be viewed as requiring a domestic company, undertaking to write new lines of insurance, to secure an amendment of its certificate to include the new lines. The intervening portions of § 32 make such a reading difficult. For example, there is little or no basis for applying to a company already in operation (when it seeks an amendment of its certificate) the provision calling for the commissioner to determine "that the company is without liabilities except" for organization expenses and (for some companies) its liabilities to stockholders for amounts paid in for shares.

Section 32 has not been amended since 1941, four years prior to the enactment of § 54C, and the introduction of multiple line underwriting in 1945. The legislative history of St. 1945, c. 384, § 2, gives slight indication of any legislative intention to affect § 32 or to apply it so as to require amendment of an outstanding certificate under that section when a company holding such a certificate proposes to write policies in a new line of business permitted under the 1945 "multiple line" legislation. The commissioner's recommendation for the 1945 legislation (1945 House Doc. No. 94, p. 3) starts out (emphasis supplied), "We believe that the privilege of multiple line underwriting, so called, should be afforded companies now in existence *as they may see fit* to take advantage of the privilege." There is no mention of the necessity of having a company's outstanding certificate amended. The recommendations quote (pp. 4–6) the report of an insurance industry committee appointed to report to the National Association of Insurance Commissioners suggesting many of the provisions of § 54C (see p. 5) with respect to automobile insurance for reasons set out in the report (p. 6). These recommendations also do not suggest that any amendment of a company's certificate under § 32 was to be required as a prerequisite of taking advantage of § 54C.

Section 32 has been considered by this court, but only with respect to an initial certificate, in *Elmer* v. *Commis-*

*sioner of Ins.* 304 Mass. 194, 197–198. There ten petitioners sought to organize a mutual insurance corporation to issue accident, liability, collision, and health insurance policies. Our opinion stated (p. 198) that, under the proviso in the second sentence of § 32, as it then read (as appearing in St. 1938, c. 357, § 2) applying only to life companies, the commissioner did have, with respect to life companies only, "discretion [to] refuse a certificate to a life company, if . . . of the opinion that the granting of it 'would . . . be prejudicial to the public interest.' " No such discretion was found then (1939) to exist under § 32 or otherwise with respect to companies other than life companies. This court ordered a writ of mandamus to issue to compel the commissioner to approve the incorporation papers in that case. Shortly thereafter, by St. 1941, c. 342, § 1, the proviso in the second sentence of § 32 was broadened to apply the discretion to "any" company. Thus the proviso is now of general application. The 1941 amendment, however, made no reference to any process of amending outstanding certificates. There is no suggestion in the *Elmer* case (although no decision on the point was necessary) that this court in 1939 thought § 32 had application except upon the issue of an original certificate under that section.

Section 32 plainly does not very clearly (a) define the commissioner's powers with respect to the issuance and amendment of certificates to carry on particular new lines of business, (b) state that it applies at all to amendment of certificates, or (c) explain the relation, if any, of § 32 to §§ 51 and 54–54F, and to the general provisions of c. 175, §§ 4 and 6. If the commissioner is to continue to assert power to require amendments of certificates issued under § 32, there is obvious need for substantial legislative clarification of that section.

The commissioner, as we have recognized, has been given very broad supervisory powers over insurance companies. See especially c. 175, §§ 4, 6; *Commissioner of Ins.* v. *First Natl. Bank*, 352 Mass. 74, 79–80; *Multi-Line Ins.*

*Rating Bureau* v. *Commissioner of Ins.* 357 Mass. 19, 21–22. We should be slow to interpret the commissioner's authority under § 32 more narrowly than the commissioner contends is necessary to protect the public interest, even if there is ambiguity concerning the scope of his authority. To do so might force him to have resort to his more drastic powers under c. 175, §§ 4 (as amended through St. 1941, c. 324) and 6 (as amended through St. 1949, c. 242, § 1).[5] The commissioner, in effect, asserts (a) that he has power to prevent a company in advance from writing new lines of insurance, if he for sufficient cause deems such expansion prejudicial to the public interest, and (b) that he is not confined to taking action (e.g. under § 6) after the company has failed to handle the new lines soundly, efficiently, or fairly. Efficient, prompt, and reasonable settlement of bodily injury claims is very important, of course, under the new "no fault" concept. See *Pinnick* v. *Cleary, ante* 1, 5 et seq.

Because the statutory provisions (§§ 32 and 54C) did not seem clear, we requested (see fn. 4, *supra*) that certain additional information be submitted to us. This was done promptly and carefully in a stipulation approved by the trial judge. The additional information includes (a) a copy of Rockland's outstanding § 32 certificate, dated June 25, 1971, which in terms recognizes the possibility that the certificate may be "amended or revoked"; (b) copies of the correspondence between Rockland and the commissioner's

---

[5] Under § 6, the commissioner may take the action there specified where he is satisfied as to "any domestic company" that it is in "an unsound financial condition, or that its business policies or methods are unsound or improper, or that its condition or management is such as to render its further transaction of business hazardous to the public or to its policyholders or creditors." The present and former commissioners may have been encouraged to think that they had power to compel insurance companies to seek certificate amendments to enter new lines of business (even under § 54C) by the provisions of c. 175, § 54 (a ½) and (g), and other similar provisions. These may suggest at least some residual control by the commissioner of any expansion of a company's activities. Rockland argues that the requirement of the commissioner's approval in § 54 (a ½) and (g) impliedly negates any power in him to withhold approval under § 54C. The statutory coordination of the various sections and clauses is so confused that we cannot accept this contention.

office with respect to the amendment of its certificate, an amendment which was affirmatively sought by Rockland by a request which may involve an implicit recognition of the commissioner's practice of requiring such an amendment when a company seeks to write new lines under § 54C; (c) a statement that there "are no regulations or procedural memoranda issued by the [c]ommissioner with respect to proceedings under" c. 175, § 32, "nor are there any forms prescribed under that section"; and (d) two further stipulations set out in the margin concerning the commissioner's administrative practice, or contentions as to his powers, to require (under § 32) application by domestic insurers for amendment of their certificates when they wish authority to write lines of insurance under § 54C which by their § 32 certificate they have not previously been authorized to write.[6]

It is plain that, under an ambiguous statutory situation, the commissioner for about a quarter of a century has been asserting the powers he now claims with respect to Rockland, despite the absence of any clear legislative grant to him of such powers.[7] His practice seems to have been consistent,

---

[6] The description of the commissioner's practice is as follows: "(d) Other domestic insurance companies [than Rockland] have sought authority to write some or all . . . lines . . . authorized under" § 54C. "Authority has been granted to those companies desiring to write lines" under § 54C "other than the so-called bodily injury liability coverage. Those companies seeking authority to write the latter coverage under" § 54C "have been advised . . . to apply for such authority pursuant to" c. 175, § 47, cl. Sixth (b). "In those instances where authority has been granted the [c]ommissioner has amended the certificate to reflect" such grant. "(e) The [c]ommissioner contends that since 1945 his office has consistently required amendments to original certificates issued under" § 32 whenever a company desires "to include a new line of insurance coverage not previously included in its certificate." Rockland contends (1) that it is improper and unnecessary for the commissioner to require such an amendment where the company's request is to transact a line of business authorized by § 54C and (2) that such an amendment is not a condition precedent to authority to transact such new line of business.

[7] In this matter the present commissioner appears to have relied only on the advice of his departmental counsel. The correspondence presented to us shows that, on November 10, 1971, the commissioner refused Rockland's entirely reasonable request that he seek an opinion of the Attorney General concerning the propriety of his position, as would have been wise for him to do in such a doubtful matter. In such situations, it will frequently avoid

although it has not been embodied by him in rules or regulations (see G. L. c. 30, § 37, as amended through St. 1970, c. 712, § 1), if it be assumed (a matter which we need not decide) that he has power to issue general rules and regulations. Nevertheless, in a confused statutory situation, a consistent, long continued, administrative practice of the public officer charged with regulating a large industry is not lightly to be disregarded and is entitled to weight in statutory interpretation. See *Cleary* v. *Cardullo's, Inc.* 347 Mass. 337, 343–344.

The uncertainty concerning the extent of the commissioner's statutory powers, and his assertion of discretionary powers (see e.g. *Berman* v. *Board of Registration in Medicine* 355 Mass. 358, 360) to protect the public interest, lead us to deny, as matter of discretion (see *Hallenborg* v. *Town Clerk of Billerica, ante,* 513, 519–520) a peremptory writ of mandamus requiring the commissioner at once to grant an amendment of Rockland's certificate. We regard the present record as inadequate, particularly concerning the nature of the administrative practices under §§ 32 and 54C. We are not impressed with the assertion that Rockland is faced with an emergency which must be dealt with before January 1, 1972, on a hastily prepared and unsatisfactory record. Accordingly we remit Rockland to renewing its application before the commissioner, and requesting a hearing (which should be held without delay and stenographically reported) for the presentation of evidence concerning the fitness of Rockland to have authority to issue personal injury liability policies under § 54C.[8] If the commissioner, after

---

litigation and possible unfairness to citizens if departmental heads seek the more objective advice of the chief nonjudicial law officer of the Commonwealth rather than relying upon their subordinates.

[8] There is indication in the insurance statutes that the Legislature intended to surround compulsory insurance with special safeguards and prerequisites to authority to write such policies, which Rockland has not shown that it has satisfied. See e.g. G. L. c. 175, § 113A, as amended through St. 1969, c. 147. It is a form of insurance, which, because compulsory, affects a very large part of the public. There thus is special occasion for the commissioner to exercise with diligence whatever powers he possesses to supervise that line of coverage.

full hearing (and the development of a complete and informative record), still refuses an amendment of Rockland's certificate, then Rockland may have resort to any remedies available to it under G. L. c. 30A, or by certiorari (G. L. c. 249, § 4, as amended through St. 1963, c. 661, § 1). In view of the obvious importance of this decision to Rockland, we think that the commissioner should make careful findings of fact and state in detail the reasons for his decision.

The present petition need not be dismissed. If there is delay in holding a hearing, the petition may be amended to seek an order to hold one.

There is no occasion to consider the alternative relief which Rockland seeks under c. 175 § 113C. If Rockland is entitled to such relief, it will be only in the event of a decision on a full record either that no amendment is necessary or that the commissioner has no discretion to deny amendment of Rockland's certificate, issues which we think should be determined only after the further hearings suggested above. Before we are faced with such a determination the ambiguous statutory situation may have been clarified helpfully and appropriately by the 1972 Legislature.

The order for judgment is reversed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*